All right. Good morning, everyone. Day one of the four days sitting here in Jacksonville. We're pleased to be in the Cho Flatt courtroom with Cho Flatt himself. Before we get going, just a couple of rules of the road that you'll understand. I think most of you have been here before. Number one, and most importantly, please know that we have read the stuff. We've read the briefs, the cases, the statutes, the record materials, so you've got limited time before us. Don't waste it with a bunch of factual and procedural ramp-up. Just get to it. Number two, traffic light system. Again, you'll understand it. Green go, yellow slow, red stop. I'm the world's worst at cutting people off in the middle of a syllable, but just respect the court's time when you see the red light begin to wrap up. All right. With that, we call the first of three somewhat related cases. CCIA, a net choice versus the Attorney General of the State of Florida. This is 2511881. Mr. DeSouza here for the appellant, Ms. Murphy here for the appellee. Mr. DeSouza, it looks like you've reserved two minutes. Yes, sir. Very well. Proceed when ready. Good morning, Your Honors, and may it please the Court, Jeffrey DeSouza for Florida's Attorney General, James Othmeyer. So, in recent years . . . Can you hike up? There it is. Okay. Is that better, Your Honor? Yeah, that's better. So, in recent years, social media use by young teens and adolescents has skyrocketed, and there's been a corresponding increase in very severe mental health consequences. Major depression rates have doubled for 10- to 14-year-old girls. ER admissions for self-harm have quintupled. So that was the problem that Florida's legislature was trying to tackle with HB 3, and it did it in overwhelmingly bipartisan fashion, and we think the State panel was absolutely correct that our law is likely constitutional. At the outset, I want to start with what I think is the core premise of the Tech Plaintiff's argument here on the First Amendment. They try to liken this case to Peckingham because they describe HB 3 as being an outright ban on access to social media for people under the age of 16, and it just is not the outright ban that they make it out to be. Children can continue to use social media if a number of things happen. Number one, the plaintiffs could stop using the addictive features on their platforms. I mean, this is part of why we say in our briefing that this is really about regulating the contractual relationship that makes access to these addictive features possible. So if they stop using the addictive features, our law does not apply to these platforms, and all of the speech is permissible. Children can all— Do we know the universe of social media applications and sites for which this law is applicable? Judge Locke, are you asking if we know the particular platforms that the law applies to? We know one of them, which is Snap. There are big questions about which other platforms are covered. Right. So does that question matter for what I think is really the first question we have to ask in a facial challenge, which is, do we know the universe of applications this applies to in order to be able to weigh the unconstitutional ones against the constitutional ones to see if the one substantially outweighs the other? You agree that is sort of— I do think it's relevant. First principle is that what we have to do in a facial challenge, right? Yeah, that's right. I do certainly think that it is relevant to the facial challenge inquiry. I also think it's relevant the age of the possible users on the platforms because we have this argument from Prince v. Massachusetts about 10 years. Somebody asked that question. I know you bring that up in your brief. So the district courts seem to suggest in a footnote that it possibly could be constitutional as applied to six-year-olds, for example, right? Right. Do we know if it is or is not, and do we know what the age group of—I know you use the word tender age—do we know what sort of the line of tender age is for which this would be constitutional and would not be? I don't know, Judge Luck, that the Supreme Court's been perfectly clear about where the line is, but I think certainly when you're talking about six-, seven-, eight-, nine-year-olds, it's a tough road to hoe for the other side to say they have the same first— Well, I'm less concerned about the Supreme Court right now, and I'm more concerned about what we know from the record that's before us. Did the district court do an analysis of how much use is done by six-year-olds, assuming six-year-olds this would be constitutional as to them, but not as to 13-, 14-, and 15-year-olds? No, the district court didn't look at that. We obviously make this argument in our papers that that's a big problem with granting facial relief. Now, I think the other side's answer to this is that because of COPPA and its limitations on data mining for people under 13, they just say, well, we're not serving people under 13, but we know that that's not true. Well, they might not be, but that doesn't mean that there aren't other applications out there that are. We just don't know, right? Isn't that the end? Yeah, I think, yeah, I agree. I agree. Let me ask you this. Is it possible that Florida's definition could apply to sites that either trade in, have some sort of user interaction with, or allow access to pornography? Yes. If the coverage formula is otherwise satisfied, yes. Right, meaning, assuming it checks off everything, there's an algorithm, it's user-based, all the things that there is one of the addictive features, in other words, continuous scroll, something like that, it could allow access to pornography for a legitimate user, right? That's right. We agree after Paxton, or do you agree after Paxton, that there are constitutional limits that are allowed for social media laws for those that access pornography, for those that are 15, 14, 13, and so on?  Do we know the universe of what applications there are for pornography at all from the district court record or the proceedings below? No, we don't. How is, how can we possibly make a determination, even if I agreed with everything that your said, determination on a facial challenge where we don't know the universe of applications and those that could be constitutionally applied and those that cannot be? Judge Luck, I think at a minimum, we win for the reasons that you're describing because this is a facial challenge, and as Moody says, when a litigant brings a facial challenge, that decision has consequences, and this would be one of them. We of course are very happy, though, to have you, like the state panel did, actually reach the merits of the First Amendment question, even setting aside the facial barrier, and say either that the First Amendment is not implicated, like in Gary and Indigo room, or, and I'd probably like to spend most of my time on this today, on the intermediate scrutiny question. So even if you thought that this was a speech regulation that triggers the First Amendment, we still, as the panel thought, the state panel thought, would prevail because at most this is a content-neutral regulation that gets intermediate scrutiny, which is deferential when it comes to tailoring. So the reason that this is a content-neutral regulation is because our coverage formula has nothing at all to do with the kinds of speech that you will find on these platforms. I mean, Packingham explains that on social media, people go and they talk about an infinite variety of categories and topics of speech, pretty much anything that a human being can dream up, they talk about it on social media. So it's content-neutral, which triggers intermediate scrutiny, not strict scrutiny. Now the other side has a couple of arguments for why, you know, they're giving it their best shot on why this is content-based. We disagree with all those. I want to quickly tick through those. So number one, they say that they've identified a category of content that HB3 regulates, which is social speech, which they explain is user-to-user speech instead of platform-to-user speech. But of course, users talk to each other about all sorts of things. I mean, that's why we have language. Language facilitates speech on, you know, just every topic under the sun. So users go on social media because they want to talk politics, they want to talk news, the latest scores in the Celtics game, you know, their hobbies, you name it, they talk about everything. And a video about chess openings is not different content simply because it's posted by a user as opposed to being posted by a platform. So both the district court and the state panel properly rejected that argument. Their second argument for content-based is an argument that, well, our regulation deals with a lot of speech. That's never been the test that the Supreme Court has laid out for differentiating between content-neutral and content-based restrictions. In TikTok, there were 170 million U.S. users whose speech could have been affected if TikTok shut down and the Supreme Court still saw fit to apply intermediate scrutiny. And then the last thing they say about this being content-based is that it's a speaker-based classification. Now, it's true the Supreme Court has sometimes said that that can be relevant, but it's only relevant if the regulation regulates speakers because of a disagreement on the part of the government with the actual content. So it has to be a smokescreen or a proxy for getting at a content-based regulation. And we just don't have that here. So because this is intermediate scrutiny, the question is, I don't think there's a serious dispute, but whether we have a significant or important governmental interest, I think ours is compelling, in fact. The question really is, is our law narrowly tailored to achieving that interest? And it unquestionably is. So we get substantial deference under cases like Paxton in TikTok when our legislature makes choices about how best to regulate to achieve that interest. We do not have to show, unlike in strict scrutiny, we don't have to show that our law is the least speech-restrictive alternative. Can I ask you one question about that? As I read Paxton, that seems to be right, but there is this other line of First Amendment cases that I've had to tangle with recently, McCullen, and then we have a follow-on case called Florida Preborn that I wrote. And frankly, in that line of cases, although purportedly applying intermediate scrutiny, boy, it feels like strict scrutiny. The court says something like, hey, it doesn't have to be the least restrictive alternative, but, oh, did you consider less burdensome alternatives? What do we do with that? Judge Newsom, I think what's going on in cases like McCullen is that you have a regulation that, according to the state, is designed to protect access to the sidewalks so that folks can get to the abortion clinic. So that's the point of the regulation. But a 35-foot buffer zone, the court found, substantially burdened well more speech than was necessary to that. And the result was that folks who wanted to do counseling on the sidewalk about abortion as opposed to other options had to do so from across the street from the clinic, where they really could not meaningfully engage with people going into the clinic. And so the court found that was simply an entire barrier to the kind of speech at issue. And so it turned to asking about, is there something less restrictive that the state could have done so that there was not that overwhelming burden on all this other speech? I think that's quite a bit different from here, where the only way that we can actually get at the societal problem with increased social media addiction, which leads to all these psychological harms, is through a regulation that looks much more like Florida's. But are you really saying then, in saying the only way we can get at this, are you sort of conceding the premise that, so maybe this does have to be the least restrictive, but it is? Because I'm trying to get the conceptual framework straight. No, I don't mean to suggest that at all. We really do think it's the deferential intermediate scrutiny standard from cases like Paxton and TikTok. I mean, those cases say that our legislature gets deference when it makes predictive judgments about what kind of measures are going to work. Now, in point of fact, I think that this is probably about as closely tailored as we would get in this context. So I think we would win under any level of scrutiny. But it is tailored in a number of respects that help to... How can that possibly be? I mean, I understand the case law saying that we don't look at under-inclusiveness, but I mean, social media sites that are at 9% are perfectly fine, yet have the same harms. And as you point out in your brief, all we're saying here is you don't have to enter into a contract. But you can do all the other stuff that we believe to be harmful to you, as long as you don't enter it into an account agreement with the minors. That seems to be a big exception, which I know you use to show how narrow-tailoring it is, but doesn't seem to meet what you say is the problem, right? So Judge, look, TikTok does say that we do not have to solve the entirety of the problem. We can tackle a subset of the problem. But if our law was structured differently, so that it swept in more speech, they would just be saying the opposite thing, which is that you're burdening too much speech. So our law really is tailored. But if tomorrow, all the social media sites that your friends on the other side represent decided, okay, no account holders anymore for those 16 and under, but we're going to do everything else the same, that doesn't attack the problem that you say is the problem, which is how you started off here, which is social media and its addictive features are causing problem to teenagers. I just don't understand how that... Judge, look, I think that the accounts actually help to facilitate the use of the addictive features like push notifications. If you don't have the account, they can't send you things like push notifications. So it is... There's things like cookies and other things that they collect information on that have nothing to do with account holders. I mean, I don't belong to any social media sites, and yet somehow I get ads that are tailored to things that I like. No, that's certainly true, but you don't have that particular addictive feature. I see my time is short. I'm happy to answer any more questions about this. That's what I call respecting the court's time. Very good. Thank you, Your Honor. All right, Ms. Murphy, let's hear from you. Good morning, Your Honors, and may it please the court, Erin Murphy on behalf of the plaintiffs. Florida's law here is part of a series of recent efforts by states to restrict access to websites based on concerns about their potential effects on minors. These kinds of laws are nothing new. Efforts to restrict access to speech have cropped up over the decades virtually any time a new medium captures the attention of minors, be it movies, television, comic books, or games. And while Florida's law may differ in its particulars from similar laws that have been enjoined throughout the country over the past few years, none of those details changes the bottom line that this law violates the First Amendment. The law is content-based because it applies only to services that disseminate speech by everyday users. Whose speech are we talking about? The speech of the users themselves we're talking about here. That is how it built into the definition of the law of a covered service is whether the service... I'm concerned about the standing challenge to raise the user's rights. Sure. We're not asserting standing on behalf of the users. What is the 1331 cause of action of the plaintiffs?  We have... Forget the children and the parents. Yeah. No one disputes that we have Article III standing. This law regulates our members directly. What is your cause of action under 1331? We have a 1983 action. This is a violation of our users' rights, of our members, the directly regulated parties under this law. Our members, they have standing from compliance costs and they have standing from their own What is the cause of action? Forget 1983. What is the cause of action stated that the plaintiffs have? That's the cause of action we state, a constant violation of our constitutional rights. Our members' constitutional rights because our members, under this court's decision in Moody and the Supreme Court's decision in Moody, have first amendment rights of their own, and so our standing is based on our... Like publishers, I suppose. Absolutely. Our standing is based on our first amendment rights. We're pointing to users not as our basis for standing. They're not our basis for standing at all. We're pointing to users because they're part of the substantive first amendment analysis. Because we brought a facial challenge, you have to ask, does the law burden more speech than necessary to accomplish the state's interest? And you can't answer that question without looking at the burdens that are imposed on our users as well as the burdens that are imposed on members. And that's where this law is just... Why I think this case is quite different in terms of what you need to know about the members than Moody, because Moody was not... The law in Moody is not a law that burdens the rights of users. It's not a law that says users can't access the service. It basically says the opposite. It says you have to let users access the service. And that's why in Moody, this court was very focused on the rights of the services. That's why the Supreme Court was focused on, we need to know the universe of services, because that's the only entities with first amendment rights under the law in Moody. Here by contrast, of course, our members have first amendment rights, but the really principle overwhelming burden that's imposed here is on the users. And that's why we've talked about the users. It's not for standing purposes. If you're not asserting the user's constitutional rights, what difference does the burden make on their rights? Because it's part of the standard under the first amendment. The question under the first amendment is, does this law burden more speech? You are traveling on your... You do say you have standing. Absolutely. Prudential standing to assert the parents and the children's rights. It's not a matter of standing. If you look at Brown... Do you have prudential standing? Sure. To assert the parents and the children's rights.  We have it. I don't think we need it, but we absolutely have it. Under Virginia booksellers, the Supreme Court said, even when the booksellers... The court said, in order to have prudential standing, you have to have a close relationship. What does that mean? It's not the test in this... No, no. What does it mean? What did the court mean when they said that? Outside the first amendment context, I think that means that you have to have more of a direct relationship with somebody, but in the first amendment... Is it like the plaintiffs in rule 23 class action, kind of representing the people in the class? Is that... No. In the first amendment context, the court... Is it like that at all? I don't think so. In the first amendment context... Well, then why did they put it in there? I mean, in the first amendment context, the court is a different... I know it's a first amendment context. Why did they say that? I don't think they said it in the first amendment context. Kowalski is a first amendment case. The way the court has said it is, in particular, if you're the vendor, then you can assert the rights of your user. That's a close enough relationship. I just want to know why they put that in there as a requirement for prudential standing. I think it's there to ensure that you're not a complete stranger to whoever's rights you're asserting, but I just... Does it have anything at all to do with issue preclusion, for example? I mean, we're not asserting that. No, no, no. Does it? It could in a particular case, perhaps. I'm not... You think that's maybe why they put it in there? In a case where you're actually asserting third party standing, it could be relevant. Could be relevant. Because the second case, or the second court, may not give it any preclusion. Could be relevant in a case that's actual third party standing where the plaintiff doesn't have standing in their own right. But again, that's... We have standing in our own right. We are not relying... I agree that you have for a cause of action alleged under 1331 that belongs to your clients. Yes. Yes. And no one's ever disputed that we have Article III standing. Can I ask you just to maybe revisit the line of questioning that Judge Luck was having with your adversary about the nature of facial challenges? Nobody is more hypersensitive to this than me. Yes. I don't want to foul it up again. But, so, with respect to the universe of applications, does Moody require, in essence, an empirical analysis? An evidentiary analysis? Or is it an impressionistic analysis? And the reason that it seems to matter is that there is a universe of sites that might include things like truththreats.com, incitement.com, whatever. They have no First Amendment protection at all. And with respect to those sites, presumably any old social media law that any old state wants to pass is going to be fine, basically. That's why we're not here challenging the other part of HB3 that is basically the same law that the Supreme Court dealt with in Free Speech Coalition versus Paxton. So that law already takes care, under Florida law, of the services that have only content or principally content that's prohibited vis-a-vis minors. So those are already out. But do you agree that, at least under this definition, whether they're out under a deference section or not, under this definition that, I'll use Judge Newsom's analogy, incitement.com, truththreats.com could apply? I mean, maybe in theory, but here's why I don't think it matters. First, this law, unlike the law, this is what's critically different between this law and the law in Moody. This law implicates the First Amendment in all of its applications because of the definition of a social media platform. How can that, counsel, I'm sorry to interrupt. How can that possibly be if you admit, theoretically, that truththreats.com and incite.com would apply? If they would apply, then it can't be that in all of its applications that this law would violate the First Amendment. So here's what's different. Counsel, that this law would violate the First Amendment. Maybe in theory you have some service out there that literally has no protected speech on it. I don't know what it is. And if it does exist, it seems like it's already covered by their other law. But nevertheless, the difference here, Moody was not an access restriction. It didn't say you can't use the service. You could use it. The whole point was to say you can use the service. You have to let the users onto the service. You have to allow their speech. Counsel, even if that's the case, it allows an access restriction for that part which is not covered by the First Amendment. So in other words, if there was a part of a site that was just pornography, then that would be fine to be able to regulate for those that are 16 and under, right? So here's what, I just kind of want to be conceptually clear. So that's what, the fact that this law- Am I right, what I just said? It could be. I mean, I don't, I think it depends a little how you're thinking about it, but I just want to kind of lay out how- I thought I was clear, but let me be as clear as I can. There's a site. There's a pornography wing to the site and a arts wing to the site. The arts wing would have protected content for everybody. The pornography wing, the Supreme Court has said, is perfectly fine and obscene for those that are under the age of, we'll call it 18 or 16. You would agree that it'd be okay to restrict access to- It would be okay to restrict access to the pornography part, which Florida does under HB 3 and we didn't challenge. They already do that. Under this section. So under this section, I don't see how this law reaches that. It doesn't really make sense to understand this law is reaching that when the law itself- Doesn't Twitter and Reddit have some obscene and or pornographic- They have some age gated content and you take all of that into account, but again, I want to get back to the point of- If we didn't take them into account, then how do we know what is okay and what's not okay for the weighing part of it? You can take them into account. The state's burden under the First Amendment, it's the state's burden to prove that the law applies, has more constitutional applications than unconstitutional applications. I guess the question I have is if the district court, not us, if the district court didn't tell us what all these different silos are and what is and is not and what the universe is, whether it is evidentiary, whether it is just, I'm guessing, in some form or manner, how can we possibly make that call? I don't think you can fault the district court when the state didn't make the argument. It's their burden and they did not argue below that the reason this law is constitutional is because in the main, it deals with sites that have pornography. That had nothing to do with their argument. Did they make the tender age argument? They made a tender age argument. I don't think that argument works because this law clearly is overbroad vis-a-vis tender age. They made no effort to show- If we don't know if the 10%, let's say a site, just in theory, a site, the 10% that minors use are minors that are between the ages of three and seven years old. There is absolutely nothing that they put in the record to suggest that's true and it's their burden and we put evidence in that shows it's not true. We show that, and this is all about the users who are 13, 12, 11. If the district court concedes that the law would be constitutional as to those of tender age, those, let's call it six, and we don't know how much of the 10% or how much of any particular site is used by six-year-olds, how can we possibly say what the weight would be for a particular site or the universe? If we don't know that, it's because the state didn't meet its burden of proving that this law applies more often to children of tender age than to 13-year-olds. They didn't meet that burden. That is their job. Even under intermediate scrutiny, it is their burden. They have to make an argument. They have to prove it up. That is not the argument. If they put on evidence below and their evidence is focused- I just want to be clear, counsel, of what you're saying. So what you're explaining to the court is it is not the independent obligation of the court in determining a facial challenge what universe of applications is constitutional and is not. It is not the court's burden to do that in a facial challenge. It's the court's burden to do that consistent with party presentation rules. And so if the state spends its whole argument saying, we don't think our law implicates the First Amendment at all, that's our core argument, but to the extent it does, we're going to make arguments that are just about why it's okay for us to do this as to 13-year-olds. And mind you, 14- and 15-year-olds, we've got a law here that treats people differently on the basis of different ages. If they want to make their entire argument be about why it's okay as to 13-, 14-, and 15-year-olds to have this, I don't think this court needs to then come and say, well, you know, you could have tried to prove something completely different and say- It's not a matter of proof. It's a matter of what the obligation of a district court is. So there's a three-step process, as I understand it, that a district court must engage in for the purposes of this. And so the district court has to ask these questions. And to the extent it acknowledges that not every application is unconstitutional, but that there is, in fact, some applications that are constitutional, at that point, don't we have to then ask what those are and whether one overwhelms or substantially- I think at a certain point, you're reading Moody in a way to have changed fundamentally First Amendment law. And I don't think that's what the Supreme Court was doing. I think the Supreme Court was saying, look, in this particular case, we have some difficulties because this is a law that focuses only on the services, and we want to know the universe of- You don't think it fundamentally changed how we do things? I have to tell you- I feel like it did. First Amendment substantive doctrine. It didn't- the court made clear it wasn't- I mean, they said at the outset, we are relying on settled First Amendment principles here about the fact that what you're supposed to do is balance out, you know, figure out the balance of how much constitutional versus unconstitutional speech is happening. It seems to me that, and I'll end with this question, it seems to me that if you look at the orders that we have in front of us, you have courts that seem to be confused over what the obligation is under Moody. You have courts that seem to say, well, it's a facial challenge, and because the law sort of applies to a lot of stuff, that's enough, without doing the pick-and-axe work that Moody seems to suggest that is required. I think the court did here exactly what the court was supposed to do. It looked at the definition of this law. This law applies to any service where people upload content and view the content of others. That implicates the First Amendment in every application except for a service that only has unconstitutional speech. And nobody has suggested there's any service that's covered by this law that is all about only unconstitutional speech, so the court did the first step. Does this law implicate the First Amendment? Yes. Then the second step, we think that's enough to show that it's content-based. It's content-based because it's saying speech by users is not the same. We don't think, we don't trust that speech the way we trust speech that comes from somebody other than users. There's no explanation for that other than distrusting the content. That's the step. Then you're at strict scrutiny. Then you say, okay, has the state shown that this law is narrowly tailored? Has the state shown that it has more constitutional than unconstitutional applications? And the state did not meet that burden, even under intermediate scrutiny. It didn't make arguments about, in the main, this law applies only to six-year-olds or in the main, this law applies only to porn sites. It made arguments about, it's okay for us to do this because we don't think these features are covered by the First Amendment. Can I, I know that you're out of time, but can I just ask one follow-up, and this may be the dumbest question of all time, but the way that you were just sort of, sort of fleshing out the decision tree, first step, second step, third step, the sort of the weighing of the constitutional versus unconstitutional applications that I have been viewing as part and parcel of the sort of front-end analysis about whether a facial challenge is even cognizable, you seem to put in step three. Oh, I don't think it's about whether a facial challenge is cognizable. I mean, the Supreme Court didn't say in Moody that the challenge isn't cognizable. It goes to whether you win. I mean, that's the ultimate question is, okay, you can bring a facial challenge. It's like part of. It's part of the substantive analysis of asking, does the law, and in a, in a, in a case like that where, you know, the court's concern is maybe you're reaching some services that aren't engaged in First Amendment activity, so it's not even about users or anything. There just may be some services that are swept in here, and maybe there's enough of them. You know, that's the substantive analysis. The law's not overbroad if in the main it's reaching services that aren't engaged in First Amendment activity. There may be Rembrandt as applied challenge, but it's not facially unconstitutional. Here by contrast, there's absolutely nothing to suggest that this is a law that in the main applies only to services that have content that's not protected by the First Amendment, or in the main applies only to, you know, six and seven year olds. That's just not, there's no reasonable basis on the record that either party developed in this case to think that, and I don't think what the Supreme Court was saying is you have to kind of think of like fanciful, possible, conceivable applications that nobody's tried to suggest are reality, and if they exist, throw out a facial challenge. That would have been a radical reconceptualization of how facial challenges work. Okay, very well. Thank you very much, Ms. Murphy. All right. Mr. D'Souza, you've got two minutes remaining. Okay, so I want to do a little bit about facial challenges and then talk about Judge Joe Flatt's question about the third party prudential standing issue. So Judge Newsom, I do think that the facial standard comes on the back end after they have established that they have, you know, as applied problems that they've identified with our law, and I think the right way to view this is that to the extent that there's any burden shifting going on where the burden would be on us, that would be on the pure First Amendment question, but when it comes to the facial challenge standard, I really do think it's their burden as the plaintiffs who chose to bring a facial challenge to show that our law is substantially overbroad, which they haven't endeavored to do. So that's probably the better way to think about it. I don't think that the facial challenge question is the threshold question. I think it goes to the kinds of relief that they can get on the back end, but because they're the plaintiffs, they have to make that showing. So you sort of like do the scrutiny analysis, and then at the tail end, you say like, and let's not forget this is a facial challenge, let's see if they can meet that as well? Yeah, I think that's exactly right, but of course, facial challenges are supposed to be rare. I mean, bread and butter constitutional litigation is supposed to be through as applied challenges. So even to the extent you have this burden shifting perhaps on the First Amendment side of things, you know, when it goes to the relief and whether a court will say, you know, in all applications or in substantially many of the applications, there's a problem, that's their burden. Now on the third party standing doctrine, I think they've got a big problem here. They really are, Judge Schoflat, relying on the third party rights of their users. Look no further than Harris versus Evans for why that's not correct. So that's an en banc decision of this court where the court said that when you actually have an antagonistic relationship, yes, right. So if there's an antagonistic relationship between the third party, who's actually being protected by the law from the first party, then the first party cannot bring the third party claim. That's Hornbook law, sort of. That's Hornbook law, so. Let's turn things around. Let's take the case where the state is prosecuting the platform under the statute, and the platform as an affirmative defense or some kind of defense asserts the children's and the parents' constitutional rights. Does that fly? Well, I actually haven't thought about that. I suspect we would have very strong arguments that it wouldn't. Because it flips the case upside down.  Yeah, no, it's a much more uncomfortable position for them to be in, but either way, I mean, at best, they would still have to deal with Kowalski and with cases like Harris. So if our law is designed to... That closeness requirement, I say, in Kowalski, because it's kind of like the plaintiff in a class 3, class action, needing to have a relationship with class members, same sort of thing. I think that makes a lot of sense. For preclusion purposes, laid down the road. Yeah, I think that's highly likely to be correct, but whatever the theoretical underpinnings of the Kowalski close relationship standard, I mean, in Harris, very similar facts. But Harris is right on point. Yeah, Harris is really right on point. So if I've convinced you of that, I don't know that I have anything else to add to it. So if the court has no further questions, thanks so much. Okay, very well. Thank you both. Case is submitted. We'll move to the second case of the day, which is...